IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS INC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>LINK US, LLC, et al.,<br><br>    Defendants. | Case No. 18-cv-07576-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS COUNTERCLAIM** |

Cisco Systems, Inc. and Cisco Technology, Inc. (collectively, "Cisco") have sued Link US ("Link") and its President, Basem Toma, for allegedly importing and selling counterfeit Cisco goods. Link's counterclaim asserts that Cisco is the party engaged in unfair competition, because it wrongfully undermines competition in the secondary market for its goods. Cisco has moved to dismiss the counterclaim while Toma has moved to dismiss for lack of personal jurisdiction or improper venue.

Toma's motion is granted and Cisco's motion is granted in part and denied in part. Cisco has not adequately alleged that Toma committed intentional acts expressly aimed at California, while Link has not adequately alleged most of the theories underlying its unfair competition claim. However, it appears possible that these defects could be remedied if the parties are allowed a chance to plead additional allegations. Therefore, dismissal is without prejudice, and Cisco's request to conduct jurisdictional discovery is granted.

## I. BACKGROUND

Cisco sells "networking and communications hardware, software, and services that utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities and campuses, and around the world." Compl. ¶ 12 (dkt. 1). Cisco alleges that Link has unlawfully

"imported, sold, offered for sale, distributed, transported, or assisted in or caused the importation, sale, offer for sale, distribution, or transportation" of counterfeit Cisco goods. Id. ¶ 27–29. It alleges that Toma is the President of Link and therefore "intimately involved in, [sic] operating LINK," "actively involved in the day-to-day management and operations of LINK," and the alter ego of Link. Id. ¶¶ 4, 30–31. Toma is a resident of North Carolina. Id. ¶ 4.

Cisco alleges that U.S. Customs and Border Protection has seized counterfeit Cisco goods "being imported by LINK, and shipped to addresses associated with LINK, on thirteen (13) separate occasions." Id. ¶ 33. It also alleges that on several occasions a Cisco investigator ordered Cisco goods from Link which proved to be counterfeits. Id. ¶¶ 44–60. The counterfeit items were shipped to the investigator in Berkeley, California. Id. ¶¶ 45, 52, 56. The return addresses on two of the packages the investigator ordered included Toma's name. Hewitt Decl. ¶ 5 (dkt. 46-2).

Link's counterclaim alleges that Cisco has attempted to stifle competition in the secondary market for its equipment, in violation of California's Unfair Competition Law ("UCL"). Amended Answer ¶¶ 134–64 (dkt. 28). Link identifies four examples of this ostensibly anti-competitive behavior. First, it claims Cisco misleads consumers into believing it is unlawful to buy its products from independent resellers by describing such sales as "unauthorized" and "peril[ous]." Id. ¶¶ 146–49. Second, Cisco ostensibly "target[s] independent resellers such as LINK for unwittingly importing suspected counterfeit goods, while turning a blind eye to comparable conduct by participants in the Cisco 'Authorized Network.'" Id. ¶ 150. Third, Cisco allegedly claims that users who buy its equipment from independent resellers are not authorized to use the software on that equipment, in an effort to sidestep copyright law's first sale doctrine. Id. ¶¶ 151–54. Finally, Cisco ostensibly misleads consumers by designating certain equipment sold on the secondary market "used" simply because it has previously been owned or sold. Id. ¶¶ 155–57.

Cisco has moved to dismiss Link's counterclaim for failure to state a claim. Cisco's MTD (dkt. 32). Toma, in turn, has moved to dismiss the claims against him for lack of personal jurisdiction or, in the alternative, improper venue. Toma's MTD (dkt. 40).

## II. TOMA'S MOTION TO DISMISS

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss for lack of personal jurisdiction. The plaintiff bears the burden of establishing the court's personal jurisdiction over a defendant. Cubbage v. Merchent, 744 F.2d 665, 667 (9th Cir. 1984). In assessing whether personal jurisdiction exists, the court may consider evidence presented in affidavits or order discovery on jurisdictional issues. Data Disc, Inc. v. Systems Tech. Assoc., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977). "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995). A prima facie showing is established if the plaintiff produces admissible evidence which, if believed, would be sufficient to establish personal jurisdiction. See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clemens Ltd., 328 F.3d. 1122, 1129 (9th Cir. 2003). "[U]ncontroverted allegations in [plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor." Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1127 (9th Cir. 2010).

Pursuant to Federal Rule of Civil Procedure 12(b)(3), a party may move to dismiss an action based on improper venue. Once the defendant challenges venue, the plaintiff bears the burden of establishing that venue is proper. Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491, 496 (9th Cir. 1979). When considering a Rule 12(b)(3) motion to dismiss, the pleadings need not be accepted as true, and the court "may consider facts outside of the pleadings." Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 324 (9th Cir. 1996).

### B. Discussion

#### 1. Waiver

Before reaching the merits of Toma's objection to personal jurisdiction, it is necessary to consider Cisco's contention that he has waived this defense. Opp'n to Toma's MTD at 8–9 (dkt. 46-1). Cisco claims that Toma waived his objection to personal jurisdiction by "act[ing] in a way that is inconsistent with raising or maintaining it." Id. at 8. It is true that the Ninth Circuit

has recognized that a personal jurisdiction defense can be waived by "deliberate, strategic behavior." Peterson v. Highland Music, Inc., 140 F.3d 1313, 1318 (9th Cir. 1998). For example, the defense would be waived if a defendant engaged in "'sandbagging' by raising the issue of personal jurisdiction on a motion to dismiss, deliberately refraining from pursuing it any further when his motion is denied in the hopes of receiving a favorable disposition on the merits, and then raising the issue again on appeal."[1] Id.

The acts Cisco points to as demonstrating Toma's waiver of his personal jurisdiction defense fall far short of "deliberate, strategic behavior." Cisco complains that Toma "has waited nearly eight months after filing of his Amended Answer to bring the instant motion and . . . has participated in case management conferences, discovery, and multiple stipulations seeking extensions of deadlines to allow all parties to pursue settlement discussions." Opp'n to Toma's MTD at 8. As Toma points out, much of the eight-month delay is attributable to continuances that Cisco either agreed to or actively sought. See, e.g. Joint Stipulation (dkt. 30). In any event, the Ninth Circuit has rejected the argument that requesting a continuance waives objections to personal jurisdiction. Benny v. Pipes, 799 F.2d 489, 493 (9th Cir. 1986) ("Generally, a motion to extend time to respond gives no hint that the answer will waive personal jurisdiction defects."). Similarly, courts have concluded that participating in discovery does not waive challenges to personal jurisdiction. Zuckerman v. Green Earth Techs., Inc., CV 10-1240 PA (FFMx), 2010 WL 11549406, at *5 n.3 (C.D. Cal. Apr. 30, 2010). Finally, as Toma points out, Cisco can hardly claim to be prejudiced by any delay in bringing this motion when the hearing is set for the same day as its own motion to dismiss and no trial date has been set. In short, Toma's participation up to this point and the moderate delay in briefing the instant motions hardly amounts to deliberate, bad-faith delay in raising personal jurisdiction as a defense.

Indeed, the facts here fall short of even Cisco's single, non-binding authority, Plunkett v.

---

[1] Cisco does not contend that Toma's personal jurisdiction defense is waived under Federal Rule of Civil Procedure 12(h)(1), which holds that "[a] party waives any defense listed in Rule 12(b)(2)-(5) by . . . failing to either . . . make it by motion under this rule; or . . . include it in a responsive pleading or in an amendment allowed . . . as a matter of course." See Opp'n to Toma's MTD at 8–9.

Valhalla Investments Servs., Inc., 409 F. Supp. 2d 39 (D. Mass. 2006). In that case, over a year passed between the filing of the answer and the defendants' motion to dismiss for lack of personal jurisdiction. Id. at 42. In that time, they "1) participated in a scheduling conference and engaged in a colloquy with the Court with respect to the nature of the case, 2) conducted discovery, 3) consented to Alternative Dispute Resolution, 4) entered into a stipulation and protective order with the plaintiff and 5) moved the Court to allow [their] Ohio counsel to appear pro hac vice." Id. Even by Cisco's account the delay in this case is shorter and Toma's participation in the litigation less extensive. Toma has not waived his objection to personal jurisdiction.

### 2. Alter-Ego Theory

Cisco appears to suggest that jurisdiction over Toma is appropriate because he is an officer and employee of Link and Link is properly subject to personal jurisdiction in this Court. See Opp'n to Toma's MTD at 9–10. Although "a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person. . . . [T]he corporate form may be ignored in cases in which the corporation is the agent or the alter ego of the individual defendant." Davis v. Metro Prods., Inc., 885 F.2d 515, 520 (9th Cir. 1989). "To apply the alter ego doctrine, the court must determine (1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist and (2) that failure to disregard the corporation would result in fraud or injustice." Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1393 (9th Cir. 1984). The Ninth Circuit has found this standard met when, for example, the individual defendants were "the sole shareholders of the corporations and the sole partners of the partnerships," "converted the assets of the various corporations and partnerships for their own use and dealt with them as if they were one," and left a number of the corporations undercapitalized. Id. at 1393–94.

Cisco pleads no comparable facts regarding Toma's relationship with Link. See generally Compl. In fact, its only allegations of an alter ego relationship are conclusory statements that Toma controls Link's day-to-day operations and is the alter ego of Link. See, e.g. id. ¶ 31 ("On information and belief, TOMA controls LINK, [and] LINK is the alter ego of TOMA."). Conclusory allegations with no factual support are insufficient to demonstrate the applicability of

5

the alter ego doctrine.

Indeed, Cisco does not appear to argue otherwise, contending instead that "proving alter ego liability . . . is not necessary if Cisco sufficiently alleges . . . that Toma himself has committed tortious acts." Opp'n to Toma's MTD at 10. It is true that "[a] corporate officers is, in general, personally liable for all torts which he authorizes or directs or in which he participates." See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1021 (9th Cir. 1985). However, as explained below in the analysis of specific jurisdiction, Cisco has not plausibly alleged Toma's participation in any tortious act.

### 3. Specific Jurisdiction

"There are three requirements for a court to exercise specific jurisdiction over a nonresident defendant: (1) the defendant must either 'purposefully direct his activities' toward the forum or 'purposefully avail himself of the privileges of conducting activities in the forum'; (2) 'the claim must be one which arises out of or relates to the defendant's forum-related activities'; and (3) 'the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.'"[2] Axiom Foods, Inc. v. Acerchem Int'l, Inc., 874 F.3d 1064, 1068 (9th Cir. 2017) (original alterations omitted). If the plaintiff is able to meet its burden of satisfying the first two prongs of this test, the defendant has the burden of demonstrating that exercising jurisdiction would not be reasonable. Id. at 1068–69.

When a case sounds in tort, courts "employ the purposeful direction test" (or "effects" test) to determine whether the first requirement for personal jurisdiction is met. Id. at 1069. The plaintiff must show that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." Id.

Cisco incorrectly argues that the effects test is satisfied by allegations that Toma "intentionally infringed [Cisco's] intellectual property rights knowing [Cisco] was located in the forum state." See Opp'n to Toma's MTD at 11 (internal quotation marks and citations omitted).

---

[2] Cisco does not argue that Toma is subject to this Court's general jurisdiction. See generally Opp'n to Toma's MTD.

6

The Ninth Circuit has held such allegations inadequate to establish personal jurisdiction after Walden v. Fiore, 571 U.S. 277 (2014), which "made clear that we must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum." Axiom, 874 F.3d at 1069–70 (quoting Walden, 571 U.S. at 287–88). "Following Walden . . . a theory of individualized targeting may remain relevant to the minimum contacts inquiry, [but] it will not, on its own, support the exercise of specific jurisdiction." Id. at 1070.

Cisco's other allegations are insufficient to demonstrate that Toma has either "committed an intentional act" or that any such act was "expressly aimed at the forum state." Cisco points to various allegations and evidence of Toma's involvement with Link's business activities to argue he must have participated in the wrongful acts it complains of. Opp'n to Toma's MTD at 12. These allegations are insufficient to satisfy the effects test. If general allegations of managerial responsibilities or involvement in a business's other transactions, see id., were sufficient to establish specific jurisdiction in this case, specific jurisdiction would extend to a company's officers in virtually every case where it extended to the company itself. That result is inconsistent with Ninth Circuit precedent. See Davis, 885 F.2d at 520.

The only act Cisco attempts to tie directly to Toma (as opposed to indirectly, by way of Link) is the delivery of counterfeit products to Cisco's investigator in California. Opp'n to Toma's MTD at 12. Cisco relies on the fact that the return address on two of those packages included Toma's name to argue that he must have been involved with the intentional act of shipping the packages to California. See id.; Hewitt Decl. ¶ 5. The mere appearance of Toma's name on the return address for these packages is insufficient to plausibly allege that he was involved in their shipment. Absent additional allegations of Toma's involvement in this conduct, it is more likely, as he argues, that his name is part of the return address simply because he set up Link's FedEx account. Reply in Support of Toma's MTD at 7 (dkt. 48).

In any event, even if Cisco has adequately alleged Toma's involvement in the sale of counterfeit goods to Cisco's investigator, those sales cannot establish "express aiming." Other Northern District of California decisions have held that "[a] plaintiff cannot manufacture personal jurisdiction . . . by purchasing the accused product in the forum state." Adobe Sys. Inc. v. Trinity

7

Software Distrib., Inc., No. C 12-1614 SI, 2012 WL 3763643, at *6 (N.D. Cal. Aug. 29, 2012). This rule makes sense, since the personal jurisdiction analysis focuses on the defendant's, not the plaintiff's, contacts with the forum. It would therefore be incongruous to allow the plaintiff to unilaterally create personal jurisdiction.

Without the sales to its investigator, Cisco lacks any allegations plausibly tying Toma to intentional acts expressly aimed at California. It therefore cannot satisfy the first prong of the personal jurisdiction test. Toma's motion to dismiss for lack of personal jurisdiction is granted, without prejudice. Because failure to satisfy the first prong is dispositive on its own, the Court need not consider the second and third prongs or Toma's alternative argument that venue is inappropriate in this Court.

That being said, it is possible that "[f]urther discovery . . . might well demonstrate facts sufficient to constitute a basis for jurisdiction" either by supporting Cisco's alter ego theory or revealing Toma's participation in intentional acts aimed at the forum state. See Harris Rutsky, 328 F.3d at 1135. Cisco's request to conduct jurisdictional discovery is therefore granted.

## III. CISCO'S MOTION TO DISMISS

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

8

particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court does dismiss a complaint for failure to state a claim, it should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). A court nevertheless has discretion to "deny leave to amend due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

**B.  Discussion**

Link's amended counterclaim alleges a single cause of action under the UCL. Amended Answer ¶¶ 158–64. The UCL prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice." Friedman v. AARP, Inc., 855 F.3d 1047, 1051 (9th Cir. 2017) (quoting Cal. Bus. & Prof. Code § 17200).

To adequately plead a claim under the UCL's unfair prong, a direct competitor must allege "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."[3] Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 544 (Cal. 1999).

To plead a claim under the UCL's fraudulent prong, a "plaintiff must show that members of the public are likely to be deceived by the [challenged] practice." Friedman, 855 F.3d at 1055. "[L]ikelihood of deception is assessed under a 'reasonable consumer standard.'" Id. "[T]o establish a fraud claim under the UCL, a plaintiff must demonstrate actual reliance," but "actual reliance . . . is inferred from the misrepresentation of a material fact." Id.

---

[3] Although as a reseller of a Cisco products, Link is Cisco's consumer and its competitor, the Court finds that Link's counterclaim should be treated as a competitor suit under the UCL. Link alleges that it suffered harm as a competitor, rather than as a consumer. See Amended Answer ¶ 161 ("These practices harm . . . independent resellers like LINK, whose ability to compete is impeded . . . . As a result of Cisco's unfair conduct, LINK has lost sales of Cisco products it otherwise would have made.").

9

Link alleges that four of Cisco's practices violate one or both of these prongs.[4] See generally Amended Answer.

### 1. Misinformation Regarding the Secondary Market

Link alleges that Cisco violates the UCL's unfair and fraudulent prongs through an "anti-competitive campaign of misinformation regarding the secondary market" for Cisco goods. See Amended Answer ¶¶ 146–49; Opp'n to Cisco's MTD at 4 (dkt. 35). According to Link, "Cisco views the market-based pricing activity in the secondary-market [for its goods] as a threat to its ability to unilaterally dictate inflated pricing through its 'Authorized Channel.'" Amended Answer ¶ 147. Cisco allegedly attempts to prejudice consumers against "secondary market and independent resellers" via warnings that "[i]t is important to buy Cisco products through authorized sources only," and about the "consequences associated with purchasing equipment through unauthorized channels." Id. ¶ 148. According to Link's counterclaim, these and similar pronouncements would mislead a reasonable consumer into believing "that the sale of Cisco goods on the secondary market is unlawful." Id. ¶ 149.

These statements are not likely to deceive consumers. A reasonable consumer would understand that sales by independent resellers are not authorized by Cisco (rather than the government) and that the "consequences" of purchasing equipment from these sources are increased risk of technical malfunctions and fewer services from Cisco (rather than legal liability). These statements are therefore neither fraudulent nor a significant threat to competition. See Cel-Tech, 973 P.2d at 544; Friedman, 855 F.3d at 1055. Link's UCL claim is dismissed insofar as it is based on these allegations.

### 2. Selective Enforcement

Link alleges that Cisco "selectively target[s] independent resellers such as LINK for unwittingly importing suspected counterfeit goods, while turning a blind eye to comparable conduct by participants in the Cisco 'Authorized Network.'" Amended Answer ¶ 150. Link's sole example of this supposed favoritism is based on a shipment of counterfeit goods which was

---

[4] Link does not contend that Cisco has violated the unlawful prong. Opp'n to Cisco's MTD at 1.

sent by an exporter "identified as Tech Data Corporation." Id. Tech Data Corporation is one of Cisco's authorized partners, and Link asserts that "Cisco took no steps whatsoever to investigate Tech Data Corporation's involvement as the 'exporter' in the . . . transaction." Id.

Cisco responds that "the named 'exporter' for counterfeit products shipped into the United States is often falsified in an effort to avoid detection . . . thus, the listing of 'Tech Data' does not in-and-of-itself indicate that the Cisco Partner was, in fact, the exporter of the counterfeit goods." Cisco MTD at 11. Link's opposition does not respond to this point, explain why it is unfair for Cisco to choose to pursue some but not all of the litigation it could initiate, or otherwise defend these allegations. See generally Opp'n to Cisco's MTD. Link's UCL claim is dismissed insofar as it is based on the selective enforcement allegations.

### 3. Software Licensing

The counterclaim complains that "Cisco seeks to interfere with the secondary market by manipulating its control over software embedded in" its equipment. Amended Answer ¶ 151. Although Cisco sells hardware, that equipment cannot run without using the embedded Cisco software. Id. Cisco allegedly stifles competition by claiming that consumers who buy Cisco equipment must license the embedded software necessary to run that equipment pursuant to the terms of Cisco's End User License Agreement ("EULA"). Id. The EULA, in turn, provides that Cisco will only grant a license to consumers who purchase Cisco equipment from an "authorized reseller, distributor, or systems integrator." Id. ¶ 151–52. Consumers who buy Cisco hardware from some other source must either buy a license to use the embedded software from Cisco itself, or (according to Cisco), forgo using the equipment they have purchased altogether. Id. ¶ 153. According to the counterclaim, "although Cisco concedes that consumers can freely buy its hardware on the secondary market, Cisco purports to prevent those same consumers from using the hardware they have lawfully purchased by prohibiting their use of the embedded software." Id. ¶ 152. Link contends that this practice is unfair and fraudulent because, "the first sale doctrine requires that consumers who purchase Cisco hardware on the secondary market also be permitted to use the embedded software." Id. ¶ 154.

It is true that under the first sale doctrine, "a copyright owner's exclusive distribution right

11

is exhausted after the owner's first sale of a particular copy of the copyrighted work." Vernor v. Autodesk, Inc., 621 F.3d 1102, 1007 (9th Cir. 2010). Link is therefore correct that, if the first sale doctrine applies, Cisco cannot lawfully prevent consumers buying on the secondary market from using its software. However, as Cisco points out, the first sale doctrine is only applicable if the software has actually been sold. See Cisco MTD at 10. "The first sale doctrine does not apply to a person who possesses a copy of the copyrighted work without owning it, such as a licensee." Vernor, 621 F.3d at 1107.

The adequacy of these claims therefore comes down to whether Cisco sells or licenses the software embedded on its equipment. If Cisco sells its software, then the first sale doctrine applies, and claims that purchasers on the secondary market cannot use the software embedded on their equipment are fraudulent and unfair. But if Cisco licenses its software, then it has a legal right to deny resellers the ability to resell that software, and its claims to that effect are neither fraudulent nor anti-competitive. The Ninth Circuit has held that "a software user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." Id. at 1111.

The parties dispute who has the burden of demonstrating that Cisco software users are or are not licensees. Compare Opp'n to Cisco's MTD at 8 ("Cisco has the burden to show that 'there was a legitimate license at the outset.'") with Reply in Support of Cisco's MTD at 4–5 (dkt. 42) (contesting that position). However, the cases they cite are inapposite, because they consider the issue in the context of infringement actions where the first sale doctrine was raised as an affirmative defense. See Microsoft Corp. v. A&S Elecs., Inc., 2017 WL 976005, at *1 (N.D. Cal. Mar. 14, 2017). In this case, the first sale doctrine is not an affirmative defense, but a necessary element of (some of) Link's UCL claims. Other Northern District of California decisions hold that when the first sale doctrine's applicability is necessary to a party's claim, that party must plead facts showing that there was a sale rather than a license. Adobe Sys. Inc. v. Norwood, No. C 10-03564 SI, 2011 WL 845923, at *5 (N.D. Cal. Mar. 8, 2011) ("In order to support her copyright misuse claim and avail herself of the first sale doctrine, Norwood must plead facts that distinguish

12

her case from Vernor."). This rule makes sense, since it aligns with the general principle that each party "bears the burden of alleging facts sufficient to support [its] cause of action." Id. (citing Twombly, 550 U.S. at 570).

The problem for Link is that its counterclaim alleges no facts distinguishing Vernor or suggesting that Cisco software users are purchasers rather than licensees. See Amended Answer ¶¶ 146–50. Its alternative argument, that even if Cisco licenses its software, its licensing agreements might be unenforceable for lack of mutual assent, see Opp'n to Cisco's MTD at 11–12, fails for the same reason. Link pleads no facts to support its theory that Cisco software users did not agree to Cisco's purported licensing agreement. See generally Amended Answer. The failure to plead facts supporting Link's theory that any licensing agreement is unenforceable distinguishes this case from Cisco Sys., Inc. v. Beccela's Etc., LLC, in which Judge Freeman declined to dismiss similar claims against Cisco because the plaintiff in that case had alleged that Cisco "does not require end users to acknowledge, read, or accept a license agreement before using the Cisco goods." No. 18-cv-00477-BLF, 2019 WL 3944986, at *9 (N.D. Cal. Aug. 21, 2019).

Link's UCL claim is dismissed insofar as it is based on these allegations. At oral argument, Link's counsel asserted that, if given leave to amend, Link could plead additional facts supporting application of the first sale doctrine. Dismissal is therefore without prejudice.

### 4. Misclassification of Equipment Sold on the Secondary Market

Finally, Link alleges that Cisco misleads consumers by misclassifying equipment sold on the secondary market as "used," even when it has never been turned on or even opened. Amended Answer ¶¶ 155–57. On its website, Cisco offers the following definition of "used."

> Cisco defines used equipment as previously owned equipment that is now owned by a party other than the original consumer. Secondary-market equipment is any Cisco equipment—whether it is represented as new, used, or refurbished—that is purchased from a seller that is not an authorized Cisco reseller or distributor. This includes both opened and unopened equipment.

Id. ¶ 156. At oral argument, Cisco's counsel explained that this means that Cisco considers its equipment "used" once it is sold to an unauthorized reseller, but not when identical equipment is

13

sold to an authorized reseller.

Using the word "used" this way is likely to mislead consumers. Cisco claims its definition is "in line with at least one common definition of the term." Cisco MTD at 13 (citing Dictionary.com's definition of "used" as "previously used or owned"). But whether or not a product is "used" is not normally understood to depend on who it has been sold to. Cisco claims that its consumers are "sophisticated companies" that would not be mislead by its counterintuitive definition. Reply in Support of Cisco's MTD at 8. But the "target population" for Cisco's products, and how that population would understand the word "used," are questions of fact inappropriate for resolution at this stage.

Cisco next suggests that because it "prominently displays its definition of the term 'used' on its website" there is no danger "that a sophisticated enterprise user would be confused." Reply in Support of Cisco's MTD at 8. But Link alleges that "Cisco's novel definition for 'used' products is buried deep in its website, under an 'FAQ' section." Amended Answer ¶ 156. The Ninth Circuit has found a disclaimer on the side of a box insufficient to cure misleading statements on the front of a box, so a disclaimer "buried deep" in Cisco's website is insufficient to set a reasonable consumer straight. Williams v. Gerber Prods. Co., 552 F.3d 934, 939–40 (9th Cir. 2008) ("We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list on the side of the box.").

Finally, Cisco argues that these claims must fail because "Link fails to allege with specificity even one instance in which Cisco's statements regarding used products actually mislead Link, Cisco Partners, end users, or the general public, despite the fact that allegations of reliance are required under the UCL." Reply in Support of Cisco's MTD at 9. "[A]ctual reliance . . . is inferred from the misrepresentation of a material fact." Friedman, 855 F.3d at 1055. The alleged misrepresentation is material—a reasonable consumer would care whether the equipment they were buying had previously been used or simply previously sold.

Cisco's motion to dismiss these claims is denied. This result comports with Judge Freeman's order in Beccela's, which declined to dismiss virtually identical UCL claims based on

14

Cisco's unusual definition of "used." 2019 WL 3944986, at *10.

### 5. Restitutionary Disgorgement

Restitution is the only monetary relief available under the UCL. Cal. Bus. & Prof. Code § 17203. In an effort to circumvent this rule, Link has requested "restitutionary disgorgement." Amended Answer at 24. The California Supreme Court has rejected efforts to characterize disgorgement or damages as "restitution" when that "term does not accurately describe the relief sought by plaintiff." Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 947 (Cal. 2003).

That is the case here. "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." Id. Its purpose is to "compel[ ] a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken." Id. This type of relief is an untenably awkward fit for Link's claims. Link claims that it has been harmed as a competitor, by business practices that unfairly divert consumers in the secondary market away from independent resellers and towards Cisco's "Authorized Resellers."[5] See, e.g. Amended Answer ¶ 161 ("As a result of Cisco's unfair conduct, LINK has lost sales of Cisco products it otherwise would have made."). Link does not have an ownership interest in the money that it alleges Cisco unfairly obtained. That money came from Link's would-be customers.

Link argues that Korea Supply Co. v. Lockheed Martin Corp. establishes that restitutionary disgorgement is available under the UCL. Opp'n to Cisco's MTD at 15–16. But this is irrelevant, because Link is not seeking "funds in which [it] has an ownership interest," regardless of whether that form of relief is termed "restitution" or "restitutionary disgorgement." Link points out that "the plaintiff in a UCL action may obtain restitution from a defendant with whom the plaintiff did not deal directly." Id. at 16 (internal quotation marks and citations omitted). It reasons that restitutionary disgorgement is therefore appropriate because "Cisco sells its goods to 'Authorized' partners who are also participants in the secondary market, and who then sell those goods to independent resellers such as Link." Id. But as noted above, Link's allegations complain of a

---

[5] This understanding of Link's counterclaim was confirmed by its counsel at oral argument.

different sort of harm—lost business due to unfair competition. That harm is not properly addressed through restitution, so Cisco's motion to strike Link's claim for "restitutionary disgorgement" is granted.

### 6. Attorneys' Fees

Attorneys' fees are appropriate in a UCL action when the action "(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter." Baggett v. Gates, 649 P.2d 874, 882 (Cal. 1982). Cisco claims that Link cannot make this showing. Cisco's MTD at 15–16. But, as Judge Freeman found in evaluating a very similar request for attorneys' fees in a substantially similar counterclaim against Cisco, it is simply too early in the litigation to make a "fact-intensive inquiry" into whether Link's counterclaim vindicates an important public right, confers a significant benefit on the general public, or is disproportionately expensive relative to its benefit. Beccela's Etc., 2019 WL 3944986, at *11. Indeed, it is impossible to know whether these conditions are met before the conclusion of the litigation. Cisco's motion to strike Link's request for attorneys' fees is denied.

## IV. CONCLUSION

For the foregoing reasons, Toma's motion to dismiss is granted and Link's motion to dismiss is granted in part and denied in part. Dismissal is without prejudice. Cisco's request to conduct jurisdictional discovery is granted.

**IT IS SO ORDERED.**

Dated: December 6, 2019

_____
CHARLES R. BREYER
United States District Judge